IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


KIMERIE LARMANGER,                                    3:11-CV-00089-BR

          Plaintiff,

                                                 OPINION AND ORDER

v.


KAISER FOUNDATION HEALTH PLAN
OF THE NORTHWEST dba KAISER
PERMANENTE; KAISER FOUNDATION
HEALTH PLAN, INC.; JUSTIN
McGOWAN; and SHAWN FERGUSON,

          Defendants.


DANIEL K. LEROUX
Portland Civil Law, LLC
610 S.W. Broadway, Suite 510
Portland, OR 97205
(503) 972-2183

          Attorneys for Plaintiff

CAROL J. BERNICK
CAROL A. NOONAN
Davis Wright Tremaine, LLP
1300 S.W. Fifth Avenue
Suite 2300
Portland, OR 97201-5630
503 778-5381

          Attorneys for Defendants


1 - OPINION AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendants' Motion (#102) for Summary Judgment.  For the reasons that follow, the Court **GRANTS** Defendants' Motion as to Plaintiff's First, Second, Fourth, Fifth, Sixth, Seventh, and Eighth Claims.

## BACKGROUND

Plaintiff Kimerie Larmanger began working for Defendant Kaiser Foundation Health Plan of the Northwest (Kaiser) in 1989.

In late 2007 Plaintiff applied for the position of Patient Care Manager (PCM).  In October 2007 Plaintiff was interviewed by a panel of Kaiser employees for the PCM position.  The panel included, among other people, Jane Gilronan, Manager of Kaiser's Medical Office, and Defendant Justin McGowan, Kaiser's Director of Primary Care Operations.

It is undisputed that McGowan was against promoting Plaintiff to the PCM position at the time of the interview because Plaintiff lacked the required educational qualifications and, in McGowan's opinion, Plaintiff lacked sufficient managerial experience.  Nevertheless, other members of the panel were in favor of Plaintiff's promotion, and, therefore, Plaintiff was promoted to PCM in October 2007.  During Plaintiff's first week as PCM, McGowan told Plaintiff that he did not believe she was qualified for the position and he did not support her promotion.

2 - OPINION AND ORDER

In mid-September 2008 McGowan ordered an audit of employee
time cards for the entire Northwest region.  During the audit it
was discovered one of Plaintiff's subordinates, Stacy Enriquez,
had timekeeping irregularities.

On September 19, 2008, Plaintiff issued a Level I Corrective
Action[1] against Enriquez.  At approximately the same time,
Plaintiff also received reports from Enriquez's co-workers that
Enriquez was negative, intimidating, and condescending.  As a
result, Plaintiff, together with Gilronan and Leigh Ohlstein, a
Human Resources (HR) representative, developed a Level II
Corrective Action for Enriquez dated September 19, 2008, that
included the co-workers' issues with Enriquez's personality.
After Plaintiff drafted the Level II Corrective Action,
additional time-card violations by Enriquez came to light.  On
September 24, 2008, even more violations came to light during a
meeting to issue a Level III Corrective Action to Enriquez.
Accordingly, Plaintiff issued a Level IV[2] corrective action to
Enriquez on September 24, 2008.

On September 26, 2008, during a meeting between Plaintiff,
Enriquez, and Ohlstein related to Enriquez's time-card issues,
Plaintiff presented an after-visit summary of a visit that
Enriquez had with a Kaiser health-care professional as evidence

---

[1] Level I is the lowest level of corrective action.

[2] Level IV is the highest level of corrective action.

3 - OPINION AND ORDER

of Enriquez's time-card reporting violations.  Enriquez did not provide Plaintiff with the after-visit summary and was not aware Plaintiff had the summary.

Enriquez was ultimately placed on administrative leave and terminated on October 9, 2008.  Plaintiff; Ohlstein; McGowan; Gilronan; and Defendant Shawn Ferguson, an HR Manager, took part in the decision to terminate Enriquez's employment.  Plaintiff delivered the decision to Enriquez.

It is undisputed that Plaintiff, Ohlstein, McGowan, and Ferguson supported the decision to terminate Enriquez.  Although Gilronan supported the decision to terminate Enriquez based on time-card fraud, she disagreed with the process.  Specifically, Gilronan testified at deposition that she believed Plaintiff should have investigated more before issuing the Level I Corrective Action.  Even though Gilronan believed the process was too accelerated, she agreed with the result.

On October 9, 2008, Enriquez filed a complaint through the Kaiser hotline alleging Plaintiff had violated the Health Insurance Portability and Accountability Act (HIPPA) when she used Enriquez's Protected Health Information (PHI); i.e., when Plaintiff used the after-visit summary as evidence to substantiate Enriquez's time-card violations.  It is undisputed that Kaiser is required by its internal policies to investigate hotline complaints.

4 - OPINION AND ORDER

In October 2008 Enriquez also filed a complaint with the United States Department of Health and Human Services Office of Civil Rights (OCR)[3] in which she again asserted Plaintiff had violated HIPPA by using Enriquez's PHI as evidence of Enriquez's time-card violations.  It is undisputed that Kaiser was required by law to investigate Enriquez's complaint filed with the OCR. Accordingly, Ferguson and Rebecca Sherlock, a member of Kaiser's compliance department, began investigating Enriquez's hotline and OCR complaints in October 2008.  Specifically, Sherlock and Ferguson investigated how Plaintiff obtained Enriquez's PHI and whether Plaintiff was authorized to use it.

On October 30, 2008, Plaintiff terminated Frank Pacosa, another Kaiser employee, for accessing the medical records of his wife and daughter without authorization in violation of Kaiser policy and HIPPA.  It is undisputed that Plaintiff, Gilronan, McGowan, Sherlock, and Ohlstein were in favor of terminating Pacosa.  Although Ferguson agreed Pacosa could no longer work at Kaiser, but he was in favor of offering Pacosa the option to retire or to resign rather than terminating him.

On December 30, 2008, Gilronan drafted a Level II Corrective Action for Plaintiff in which Gilronan stated Plaintiff's performance did not meet Kaiser standards as follows:

---

[3] It is undisputed that the OCR is responsible for enforcing United States health-care privacy laws.

5 - OPINION AND ORDER

      1.    Accelerated and inappropriate Corrective Action
           process that did not allow employee to respond
           with action plan to improve performance.  Intent
           of CA is to improve performance and terminate as
           last resort when no improvement is observed or
           measured.

      2.    Communications are perceived as abrupt,
           condescending, and threatening and that active
           listening is absent.  Employees do not feel they
           are listened to nor have opportunity to be heard.

Decl. of Jane Gilronan, Ex. 1 at 1.  Gilronan did not intend to deliver the Corrective Action to Plaintiff until after Kaiser's investigation into Plaintiff's use of Enriquez's PHI was complete.

At some point in January 2009 Plaintiff applied for and was granted intermittent leave under the Family Medical Leave Act (FMLA) for migraines retroactively effective January 1, 2009.  It is undisputed that Plaintiff was never denied a request to miss work because she had a migraine.

In January 2009 Sherlock finished investigating Enriquez's complaints and concluded they were substantiated.  Specifically, Sherlock concluded Plaintiff had used Enriquez's PHI in violation of Kaiser's privacy policies.  Plaintiff testified at deposition that she does not have any reason to believe Sherlock is biased against her.

On January 20, 2009, Gilronan advised Plaintiff that she would be receiving a corrective action and that Kaiser's compliance department had recommended the highest level.

6 - OPINION AND ORDER

On January 26, 2009, Sherlock issued an Investigation Report in which she reported Plaintiff alleged Enriquez's PHI was placed in the in-box outside of Plaintiff's office during the first week of July 2008.  Sherlock, however, found Plaintiff, in fact, went through Enriquez's WOW (recycling) box prior to her meeting with Enriquez.  Sherlock also reported Plaintiff admitted to using Enriquez's after-visit summary.  Sherlock concluded Plaintiff intentionally used Enriquez's after-visit summary without Enriquez's knowledge in violation of Kaiser policy and HIPPA. Sherlock recommended Plaintiff receive a Level III Corrective Action and that Plaintiff should be supervised when applying corrective actions to employees in the future.

On January 27, 2009, Gilronan met with Plaintiff and advised her that she would be receiving a high-level corrective action.

On February 5, 2009, Plaintiff made an anonymous complaint on the Kaiser Hotline in which she asserted, among other things, that "Ferguson has gone too far in this investigation of manager (name declined) and is creating a hostile work environment for the manager and instilling a 'gag order' so that the manager cannot discuss the matter with anyone."  Decl. of Missy Maese, Ex. 3 at 1.  Plaintiff alleged Ferguson was "taking the discovery of the manager too far, is still pursuing the matter and not looking at the facts the manager has shown him." *Id.*  Plaintiff also alleged Ferguson was "not willing to review any of the

documents used in terminating an employee that was committing
fraud against the company," was "told last summer that
[Plaintiff] was a terrible person, so then . . . started telling
people that [she] was a terrible person," and refused to
participate in Pacosa's unemployment hearing.  *Id*. at 1-2.

Kaiser Compliance Officer Mary Jo Gardner investigated the
Kaiser Hotline complaint.  It is undisputed that no one but
Gardner and Sherlock knew Plaintiff made the February 5, 2009,
Hotline complaint.

On February 5, 2009, Plaintiff's attorney sent a letter to
Kaiser's Legal Department in which counsel asserted Plaintiff

> has been harassed, bullied and threatened
> regarding an alleged PHI violation, relating to a
> complaint made by Stacy R. Enriquez, a disgruntled
> employee who was terminated at the direction of
> Leigh Ohlstein (Human Resource Consultant) and
> Justin McGowan (Service Area Director) and the
> Compliance Department.
>
> [Plaintiff's] direct manager, Jane Gilronan, has
> stated to my client that the recommendation for
> discipline was that [Plaintiff] receive a level 3,
> the highest discipline level and would need to be
> placed on administrative leave for a day of
> decision.  [Plaintiff] was told by Jane that as
> soon as Shawn Ferguson finished editing the
> document that she had to sign the corrective
> action document when it was issued.  She was also
> instructed that she could not discuss the matter
> with anybody. . . .  Shawn Ferguson has apparently
> been the driving bee behind this vendetta, and has
> been harassing and bullying [Plaintiff].
>
>                    * * *
>
> Mr. Ferguson's participation in the process, who
> has previously stated to others in Kaiser that my

> client is a "crappy manager", has rendered the
> discovery process a sham.

Pl.'s Dep., Ex. 21 at 1-2.

On August 3, 2009, Gardner closed Plaintiff's February 5, 2009, Hotline complaint and concluded Plaintiff's complaints were unsubstantiated and/or invalid.  For example, as to Plaintiff's assertion that Ferguson improperly installed a "gag order," Gardner noted it is standard Kaiser procedure for the HR Manager and staff to advise that all investigations are confidential and to request that anyone who is being investigated or giving information should not discuss it with others.  Gardner also concluded Ferguson followed standard procedure in his investigation of the Enriquez matter and did not take discovery of Plaintiff "too far."  Moreover, Gardner did not find any evidence to substantiate a number of Plaintiff's claims despite interviewing several individuals.

On March 23, 2009, Plaintiff began FMLA leave for pneumonia. Plaintiff returned to work in May 2009.

On May 21, 2009, the OCR sent Doris Empey, a Kaiser Privacy Officer, a letter containing the results of its investigation of Plaintiff's use of Enriquez's PHI in which the OCR advised:

> When [Plaintiff] was questioned by [Enriquez] on
> how she obtained the After Visit Summary, she
> allegedly told [Enriquez] that it somehow showed
> up on her desk.  [Plaintiff] later changed her
> position and stated that she may have found it in
> a recycling box.  Finally, [Plaintiff] contended
> that [Enriquez] herself gave her the After Visit

9 - OPINION AND ORDER

Summary though another employee, Cary Chetney,
[Plaintiff] did not arrive at ths last theory
until January 2009. [Plaintiff] submitted a
signed letter from Ms, Chetney stating that on
July 2, 2008, [Enriquez] asked Ms. Chetney to put
her After Visit Summary in [Plaintiff's] mailbox
due to the fact that her knee was hurting her and
she could not walk all the way back to
[Plaintiff's] office. How Ms. Chetney could have
remembered so clearly an event dating back over 6
months is unexplained.

In OCR's communications with [Enriquez], she
denied leaving her After Visit Summary around the
office or building as she still had the original
in her possession. [Enriquez] produced a copy of
her After Visit Sum to OCR. [Enriquez] denied
ever giving Ms. Chetney her After Visit Summary to
give to [Plaintiff]. [Enriquez] alleged, that
Ms. Chetney and [Plaintiff] are good friends
outside of work, putting into question the
reliability of Ms. Chetney's statement.

On the balance of the evidence, [Plaintiff's]
various explanations for how she obtained
[Enriquez's] medical records lack credibility.
Her actions indicate a lack of knowledge about
basic principles of the Privacy Rule and an
inability to distinguish between medical records
and personnel records.

Maese Decl., Ex. 4 at 1-2. The OCR required, among other things,

that Kaiser submit a "plan of correction" to include a corrective

action plan for Plaintiff.

On June 5, 2009, Gilronan issued to Plaintiff the Corrective

Action that Gilronan had drafted in December 2008. The

Corrective Action was identical to the December 2008 draft except

it included mandatory training and weekly meetings related to

Kaiser's privacy policy as required by the OCR. Despite

Sherlock's recommendation for a Level III Corrective Action and

10 - OPINION AND ORDER

the OCR finding that Plaintiff was not credible, Gilronan adhered to her December 2008 draft and finalized the draft as a Level II Corrective Action.  Plaintiff and Gilronan signed the Level II Corrective Action on June 8, 2009.

In October 2009 Gilronan resigned from Kaiser, and McGowan became Plaintiff's temporary supervisor until Kaiser could hire a replacement for Gilronan.

On October 19, 2009, McGowan sent an email to a number of Kaiser departments advising them that Gilronan had resigned and that Plaintiff would be "picking up responsibilities for the MTS UCC group."

Shortly after McGowan became Plaintiff's supervisor, he began receiving complaints that Plaintiff was bullying and manipulating her staff.  For example, on November 6, 2009, McGowan received an email from Debbie Anderson, N.W. Regional Primary Care Medical Scheduling Lead, in which she stated "[t]he recent announcement that [Plaintiff's] scope of PCM responsibilities will again include MTS UCC is prompting my email to you."  Anderson advised McGowan that she

> felt a need to share some past concerns I've had with [Plaintiff].  I worked with [Plaintiff] when she was the MTS UCC PCM about a year ago.  I regret to say that it was not a positive experience. . . .  With [Plaintiff] assigned to other duties these past months, I've had an opportunity to reflect on what didn't work well then.  Here are a couple of issues I struggled with.

11 - OPINION AND ORDER

>    *    Lack of and/or poor communication.  I have a
>    few examples of email strings that indicate the
>    amount of work driven by [Plaintiff's]
>    communication style [documents attached].
>
>    *    Preoccupation with her position . . .
>         [example document attached].
>
>    My latest interaction with [Plaintiff] is
>    reminiscent of past interactions. . . .  To be
>    honest, I'm leery of [Plaintiff's] agenda and its
>    [*sic*] for this reason I will continue to keep a
>    record of all correspondence.  Please note that
>    the documentation I have is not limited to this
>    email.  Since I do keep records, I have additional
>    examples.

McGowan Decl., Ex. 3 at 1.

In November 2009 McGowan met with several Kaiser employees who expressed concerns about Plaintiff's communication and management style.  McGowan's contemporaneous notes of those conversations reflect Kaiser employees' comments that Plaintiff was not trusted, and, as a result, people needed "to get stuff in email"; she is "always playing games"; she "needs to learn" to manage people; and "every interaction" with her is "less than pleasant."  McGowan Decl., Ex. 4 at 2-5.

On November 13, 2009, McGowan issued a Level III Corrective Action to Plaintiff based on complaints that McGowan received from various Kaiser employees.  In the Level III Corrective Action, McGowan required Plaintiff to "create a positive and supportive work environment.  Treat all staff members consistently"; to "[d]eliver consistent communication with clear direction for your . . . staff"; and to refrain from having any

12 - OPINION AND ORDER

conversations that staff perceived as "abrupt, condescending or coercive."  McGowan Decl., Ex. 5 at 1.  McGowan noted Plaintiff could satisfy these directives only if Plaintiff achieved 100% of the metrics set by Kaiser's Regional Office.  Plaintiff acknowledged at deposition that the metrics set by Kaiser's Regional Office constituted the minimal level of achievement required by Kaiser.  Plaintiff met or exceeded the threshold in 12 of the 14 metrics in her previous performance review.

The Level III Corrective Action also required Plaintiff to "[d]emonstrate ability to deal with difficult situations, make difficult decisions, and deliver consistent message in an positive/collaborative manner" and to "[d]emonstrate clear ability to work collaboratively in a team setting with management team, clinical leaders and line/patient care staff."  McGowan Decl., Ex. 5 at 1.  The Level III Corrective Action indicated achievement of those goals would be measured via "employee feedback of PCM by 360 survey" as well as other things.  *Id.*

Plaintiff worked with Ohlstein and Juan Mejia, a member of Kaiser's HR department, to develop a plan to improve her performance and met with McGowan twice to review the plan.

On December 15, 2009, Plaintiff met with Richard Smith, Kaiser's Vice President of HR; showed Smith a copy of her November 2009 Level III Corrective Action; and asserted Ferguson was writing corrective actions that were unrealistic and unfair

because the Level III Corrective Action required Plaintiff to
meet 100% of the metrics.  The record reflects, however, that
Ferguson was not involved in preparing or writing Plaintiff's
November 2009 Level III Corrective Action.

On December 30, 2009, McGowan met with Wendy Kraemer,
another PCM, who reported Plaintiff told Kraemer that Kraemer had
offended Bob Wall, a nurse in urgent care, when Kraemer said
Wall's nurses were lazy.  McGowan Decl., Ex. 8 at 9.  Kraemer
followed up with Wall, who advised Kraemer that he had not been
offended by Kraemer's comment.  Wall, however, stated he was
upset with Kraemer for "bringing up the triage issue."  McGowan
Decl., Ex. 6 at 2.  Kraemer advised Wall that she had brought up
"the triage issue" with Plaintiff only in the context of
explaining Kraemer's comment.  As a result, Kraemer felt
Plaintiff had manipulated the conversation and "triangulated" her
staff.  McGowan met with Wall on December 30, 2009, who confirmed
his interactions with Kraemer and Plaintiff, noted he did not
trust Plaintiff, and observed Plaintiff "is known for
triangulation and manipulating conversation."  McGowan Decl.,
Ex. 6 at 5.

According to McGowan's contemporaneous notes on December 30,
2009, Melinda Converse, a Kaiser manager, reported to McGowan
that a Kaiser doctor had sent out a survey to the UCC staff
asking about Plaintiff's "good qualities" and telling UCC staff

that he did not want "to hear negatives." McGowan Decl., Ex. 6 at 4. Converse also reported to McGowan that Plaintiff "treats her staff like children. Her conversations are like a parent talking to a 2/3/4 yr. old." *Id.*

On January 5, 2010, McGowan met with Mark Harvey, APD. McGowan's notes reflect Dr. Harvey thought Plaintiff was "trying very hard, but does not have the skills to be successful . . . [and] she creates issues between her peers based on her communication." McGowan Decl., Ex. 8 at 10.

On January 8, 2010, Plaintiff met with Andy McCulloch, Kaiser's Regional President. Plaintiff showed McCulloch her June and November 2009 Corrective Actions and asserted she was being held to "perfection." According to Plaintiff, McCulloch advised her that he does not override his subordinates' personnel decisions, but he would "look into it." McCulloch also advised Plaintiff to talk to Smith.

On January 18, 2010, Plaintiff was scheduled to meet with McGowan to discuss her workplan. Although the parties' accounts differ as to what occurred, it is undisputed that Plaintiff brought her husband (also a Kaiser employee) with her to the meeting without first notifying McGowan. McGowan asked Plaintiff's husband to leave. Plaintiff or her husband advised McGowan that information on Oregon's Bureau of Labor and Industry's (BOLI) website suggested Plaintiff had a right to have

an "advocate" with her at the meeting.  Plaintiff did not provide
any support for her assertion.  McGowan contacted Kaiser's HR
Department to determine whether Plaintiff had the right to have
her husband at the meeting.  Ferguson, in his capacity as an HR
manager, advised McGowan that the law did not entitle Plaintiff
to an advocate under the circumstances, and the decision whether
to allow Plaintiff's husband to stay was up to McGowan.[4]  McGowan
related the information from HR to Plaintiff and her husband and
again asked Plaintiff's husband to leave.  According to McGowan,
Plaintiff's husband asked McGowan to write his name down, which
McGowan refused to do on the ground that he was uncomfortable
writing his name on a blank sheet of paper due to their
interactions, and, in any event, Plaintiff already knew McGowan's
name and title.  Ultimately Plaintiff's husband left.  According
to Kaiser's report to BOLI, Plaintiff's husband told McGowan that
he was "going to call the government," and McGowan would be
"fired by Friday."  At that point McGowan declined to proceed
with the meeting and rescheduled it.

        Later on January 18, 2010, Ferguson sent Plaintiff an email
in which he advised her that,

        [a]s a non-union employee, you do not have a right

---

        [4] Due to the nature of the meeting and the fact that
Plaintiff was not a member of the Union, it is undisputed that
Plaintiff was not entitled to have a representative at the
meeting.  Plaintiff contends only that she believed at the time
of the meeting that she was entitled to bring her husband.

> to bring a family member or another employee into
> a meeting with your supervisor.  Your husband will
> not be allowed into future meetings with
> [McGowan], and any attempt to do so will be
> considered insubordination.
>
> I also need to be very clear that your husband's
> behavior this morning was unacceptable.  You will
> be held accountable for any such behavior in the
> future.
>
> If you have concerns regarding your employment
> situation or next steps, the appropriate resources
> include me or Kevin Dull in HR, or Wendy Watson as
> [McGowan's] supervisor.

Decl. of Carol Noonan, Ex. 1 at 151.

On January 20, 2010, Susan Blevins, a nurse team-leader, sent McGowan an email in which Blevins set out a complicated set of facts related to Plaintiff's actions as Wall's manager. Blevins's overarching concern was that Plaintiff's communication with her staff "creates a wedge between nurses, not team work," and, "[i]n the future, I would prefer if Melinda or Wendy can follow up with any concerns I have regarding staff [Plaintiff] is responsible for.  My goal is to build teamwork through communication not tear it apart."  McGowan Decl., Ex. 7 at 1.

On January 21, 2010, McGowan met with Blevins and Wall to review the facts that Blevins set out in her email.  McGowan's notes of the meeting reflect Blevins and Wall were both "very unhappy with [Plaintiff] and feel they were set up to be angry with each other."  McGowan Decl., Ex. 7 at 6.  Blevins believed Plaintiff was "attempting to create issue[s] between staff

17 - OPINION AND ORDER

instead of helping them work together." *Id*.

Also on January 21, 2010, Plaintiff was deposed in the action that Enriquez brought against Kaiser. When Plaintiff was at the Enriquez deposition, Ferguson said he had reread his January 18, 2010, email to her and thought "it was a bit harsh [and] . . . that was not his intent." Pl.'s Dep. at 186.

On January 21, 2010, Plaintiff also renewed her application for intermittent FMLA leave. Plaintiff provided Kaiser with the necessary documentation from her physician on February 1, 2010, and her request was granted retroactive to January 1, 2010. Plaintiff, however, did not take any medical leave between January 1, 2010, and the date of her termination on February 8, 2010.

As a result of the January 20, 2010, email and January 21, 2010, meeting, McGowan reinterviewed in the latter half of January 2010 several Kaiser employees who had previously complained about Plaintiff's conduct to determine whether there had been any improvement in Plaintiff's behavior. According to McGowan's contemporaneous notes, Carol Donnelly, a Kaiser manager, advised McGowan that when she presented personnel issues to Plaintiff regarding staff members who reported to Plaintiff, Plaintiff would "not handle it with the staff." McGowan Decl., Ex. 8 at 1. Travis Lemke, a Kaiser scheduler, advised McGowan that Plaintiff is "great at triangulation." *Id*. at 2. Keri

18 - OPINION AND ORDER

Poitras, a Kaiser scheduler, reported Plaintiff coached her on
how to fill out the December 2009 survey from the Kaiser doctor
related to Plaintiff's performance.  Poitras also advised McGowan
that Plaintiff had told her "Melinda [Converse] was out to get
her."  When Poitras spoke to Converse, however, she found
Converse "was not unhappy with" Poitras.  *Id.* at 4.  Based on
this information, McGowan believed Plaintiff's relationship with
her staff had become "irreparable."  McGowan Decl. ¶ 13.

On February 8, 2010, McGowan and David Gustafson, a member
of Kaiser's HR department, met with Plaintiff and terminated her
employment for failure to improve the deficiencies in her
performance that were identified in her corrective actions.
Ferguson did not participate in Plaintiff's termination.

On January 24, 2011, Plaintiff filed an action in this Court
against Kaiser, McGowan, Ferguson, Chris Kitchel, and Ryan Gibson
in which Plaintiff brought claims against Kaiser for
(1) violation of the Family Medical Leave Act (FMLA), 29 U.S.C.
§ 2601, *et seq.*; (2) violation of the Oregon Family Leave Act
(OFLA), Oregon Revised Statute § 659A.150, *et seq.*;
(3) disability discrimination in violation of Oregon Revised
Statute § 659A.109 and/or § 659A.112; (4) violation of
whistleblower protection under Oregon Revised Statute § 659A.199,
(5) violation of whistleblower protection under Oregon Revised
Statute § 659A.230, (6) retaliation for opposing unlawful

19 - OPINION AND ORDER

discrimination in violation of Oregon Revised Statute
§ 659A.030(1)(f); (7) failure to pay back-wages in violation of
Oregon Revised Statute § 659A.140; and (8) wrongful discharge.
Plaintiff also brought a claim against McGowan, Ferguson,
Kitchel, and Gibson for aiding and abetting discrimination in
violation of Oregon Revised Statute § 659A.010(1)(g) and a claim
against Kitchel and Gibson for breach of fiduciary duty.  On
February 22, 2011, Plaintiff filed a First Amended Complaint to
include additional facts in support of her claims.

On March 14, 2011, Defendants Kitchel and Gibson filed a
Motion to Dismiss Amended Complaint as to claims against them.

On May 25, 2011, the parties filed a Stipulation to allow
Plaintiff to file a Second Amended Complaint.

On July 26, 2011, the Court issued an Opinion and Order in
which it granted the Motion to Dismiss Amended Complaint filed by
Defendants Kitchel and Gibson and granted Plaintiff leave to file
a Second Amended Complaint against those Defendants to state a
claim if possible.

On July 27, 2011, the parties filed a Stipulated Dismissal
of Kitchel and Gibson.

On September 23, 2011, Plaintiff filed a Second Amended
Complaint.

On January 4, 2012, the Court granted Plaintiff leave to
file a Third Amended Complaint.  On that same day, Plaintiff

filed a Third Amended Complaint against Kaiser Foundation Health
Plan of the Northwest; Kaiser Foundation Health Plan, Inc.;
McGowan; and Ferguson alleging claims against Kaiser for
(1) violation of FMLA, (2) violation of OFLA, (3) disability
discrimination in violation of Oregon Revised Statute
§ 659A.109/112, (4) violation of whistleblower protection under
Oregon Revised Statute § 659A.199, (5) violation of whistleblower
protection under Oregon Revised Statute § 659A.230,
(6) retaliation for opposing unlawful discrimination in violation
of Oregon Revised Statute § 659A.030(1)(f), (7) wrongful
discharge, and (8) failure to pay back-wages in violation of
Oregon Revised Statute § 652.140/150.  Plaintiff also alleged a
claim against McGowan and Ferguson for aiding and abetting
discrimination and retaliation in violation of Oregon Revised
Statute § 659A.010(1)(g).

     Defendants moved for summary judgment as to all of
Plaintiff's claims.

     On June 6, 2012, the Court heard oral argument on
Defendants' Motion for Summary Judgment.  At the hearing
Plaintiff withdrew her Third Claim for disability discrimination
in violation of Oregon Revised Statute § 659A.109/112.  The Court
directed Plaintiff to file a supplemental memorandum "specifying
what Plaintiff contends is the causal link between protected
activity and the harm for which she is seeking recovery" and

21 - OPINION AND ORDER

directed Defendants to file a supplemental response.

On August 1, 2012, the Court heard oral argument on
Defendants' Motion for Summary Judgment and denied that portion
of Defendants' Motion related to Plaintiff's wages; allowed the
parties to conduct discovery on the issue of Plaintiff's wage
claim; directed Defendant to file any renewed Motion for Summary
Judgment related to Plaintiff's wage claim no later than
October 11, 2012; and took the remainder of Defendants' Motion
for Summary Judgment under advisement.

## STANDARDS

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." *Washington Mut. Ins. v. United
States*, 636 F.3d 1207, 1216 (9th Cir. 2011). *See also* Fed. R.
Civ. P. 56(a). The moving party must show the absence of a
dispute as to a material fact. *Rivera v. Philip Morris, Inc.*,
395 F.3d 1142, 1146 (9th Cir. 2005). In response to a properly
supported motion for summary judgment, the nonmoving party must
go beyond the pleadings and show there is a genuine dispute as to
a material fact for trial. *Id.* "This burden is not a light one
. . . . The non-moving party must do more than show there is
some 'metaphysical doubt' as to the material facts at issue." *In
re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010)

(citation omitted).  A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 514 (9th Cir. 2011)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The court must draw all reasonable inferences in favor of the nonmoving party. *Sluimer v. Verity, Inc.*, 606 F.3d 584, 587 (9th Cir. 2010).  "Summary judgment cannot be granted where contrary inferences may be drawn from the evidence as to material issues." *Easter v. Am. W. Fin.*, 381 F.3d 948, 957 (9th Cir. 2004)(citing *Sherman Oaks Med. Arts Ctr., Ltd. v. Carpenters Local Union No. 1936,* 680 F.2d 594, 598 (9th Cir. 1982)).  *See also Tr. of S. Cal. Int'l Bd. of Elec. Workers - Nat. Elec. Contractors Ass'n Pension Plan v. DC Associates, Inc.*, 381 F. App'x 650, 652 (9th Cir. 2010)(same).  A "mere disagreement or bald assertion" that a genuine dispute as to a material fact exists "will not preclude the grant of summary judgment." *Deering v. Lassen Cmty. Coll. Dist.,* No. 2:07-CV-1521-JAM-DAD, 2011 WL 202797, at *2 (E.D. Cal., Jan. 20, 2011)(citing *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1987)).  *See also Found. for Horses and Other Animals v. Babbitt,* 154 F.3d 1103, 1106 (9th Cir. 1998)(same).  When the nonmoving party's claims are factually implausible, that party must "come forward with more persuasive evidence than otherwise would be necessary." *LVRC*

*Holdings LLC v. Brekka*, 581 F.3d 1127, 1137 (9th Cir. 2009)

(citing *Blue Ridge Ins. Co. v. Stanewich*, 142 F.3d 1145, 1149

(9th Cir. 1998)).

The substantive law governing a claim or a defense

determines whether a fact is material. *Miller v. Glenn Miller*

*Prod., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006).  If the

resolution of a factual dispute would not affect the outcome of

the claim, the court may grant summary judgment. *Id.*


**DISCUSSION**

**I.  Plaintiff's claims under FMLA and OFLA and portions of her
     claim for wrongful discharge.**

In her Third Amended Complaint Plaintiff alleges the

following with respect to her First and Second Claims for

violation of FMLA and OFLA:

> Plaintiff utilized intermittent protected medical
> leave throughout 2009 approved by her employer,
> and utilized leave for a serious health condition
> taking her off work from approximately March 23,
> 2009 through May 25, 2009.  Plaintiff never used
> more medical leave beyond that to which she was
> entitled.
>
> Defendants interfered with, retaliated and
> discriminated against Plaintiff for inquiring
> about and/or invoking her rights under FMLA and/or
> complaining about medical leave retaliation, by
> taking adverse employment actions against
> Plaintiff, including, but not limited to,
> subjecting Plaintiff to procedures not authorized
> by the FMLA, failing to timely renew Plaintiff's
> intermittent medical leave status, taking
> Plaintiff's use of protected leave in placing her

24 - OPINION AND ORDER

> on a corrective action plan in or about June of
> 2009, by terminating Plaintiff's employment, and
> discouraging Plaintiff from taking future medical
> leave.

Third Am. Compl. at ¶¶ 63-64.  Plaintiff alleges the following

with respect to that portion of her claim for wrongful discharge

related to taking and/or requesting FMLA leave:

> At all materials times, the public policy of the
> State of Oregon was to prohibit an employer from
> . . . interfering with, and discriminating against
> employees who inquire about and/or attempt to
> utilize the provisions of OFLA and/or FMLA.
>
>                        * * *
>
> Defendants, through their agents and/or employees,
> violated these public policies by . . .
> interfering with, retaliating, and discriminating
> against Plaintiff for inquiring about and/or
> utilizing the provisions of OFLA and/or FMLA.
> Defendants violated the above public policies in
> terminating Plaintiff.  The discharge was unlawful
> and in violation of the public policy of the State
> of Oregon.
>
> Defendants' discharge of Plaintiff was in
> retaliation for Plaintiff's pursuit and exercise
> of Plaintiff's rights related to Plaintiff's role
> as an employee, including the right to protected
> medical leave without fear of retaliation, which
> rights are of important public interest.

Third Am. Compl. at ¶¶ 99-101.

In her Supplemental Statement Plaintiff limits her FMLA and

OFLA claims and that portion of Plaintiff's wrongful-discharge

claim based on FMLA and OLFA to the fact that she received a

Level II Corrective Action two weeks after returning from medical

leave in 2009 and was terminated three weeks after renewing her

25 - OPINION AND ORDER

request for intermittent FMLA leave in 2010.

**A.   The Law.**

**1.   FMLA**

When a plaintiff alleges retaliation for exercising her rights under FMLA,[5] the Ninth Circuit has held such a claim is properly analyzed as an interference claim pursuant to 29 U.S.C. § 2615(a).  *See Liu v. Amway Corp*, 347 F.3d 1125, 1135 (9th Cir. 2003)("[T]he statutory and regulatory language of FMLA makes clear that where an employee is subjected to negative consequences simply because he has used FMLA leave, the employer has interfered with the employee's FMLA leave rights. . . .  In contrast, where an employee is punished for *opposing* unlawful practices by the employer, the issue then becomes one of discrimination and retaliation.")(emphasis in original).

The Ninth Circuit has held the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), does not apply to interference claims under § 2615(a).  *Liu*, 347 F.3d at 1135.  When "an employee alleges that his or her FMLA leave is impermissibly considered in the decision to terminate him or her, this Circuit applies the standard set forth

---

[5] The parties agree Plaintiff's OFLA claims are subject to the same analysis as her FMLA claims pursuant to Oregon Revised Statute § 659A.186(2).  The Court's analysis of Plaintiff's FMLA claims, therefore, applies equally to Plaintiff's OFLA claims.

by the [Department of Labor (DOL)] in 29 C.F.R. § 825.220(c)."
*Id*.

Under the DOL standard, an employee may prove her
claim that her employer interfered with her right to take
protected leave by showing "by a preponderance of the evidence
that her taking of FMLA-protected leave constituted a negative
factor in the decision to terminate her."  This claim, like any
ordinary statutory claim, may be proven "by using either direct
or circumstantial evidence, or both."  *Bachelder v. Am. West
Airlines, Inc*., 259 F.3d 1112, 1125 (9th Cir. 2001).  Ultimately,

> [t]o prevail [in a FMLA claim], an
> employee must prove, as a threshold
> matter, that the employer violated
> § 2615 by interfering with, restraining,
> or denying his or her exercise of FMLA
> rights.  Even then, [the damages
> provision of FMLA,] § 2617, provides no
> relief unless the employee has been
> prejudiced by the violation.

*Ragsdale v. Wolverine World Wide, Inc*., 535 U.S. 81, 89 (2002).

**2.  Wrongful Discharge**

Under Oregon law an employer may discharge an
employee at any time for any reason unless doing so violates a
contractual, statutory, or constitutional requirement.  *Yeager v.
Providence Health Sys. Or.*, 195 Or. App. 134, 140 (2004).  The
tort of wrongful discharge is a narrow exception to this general
rule.  *See Dew v. City of Scappoose*, 208 Or. App. 121, 140
(2006).  The tort of wrongful discharge was not intended to be a

27 - OPINION AND ORDER

tort of general application but rather an interstitial tort to provide a remedy when the conduct in question is unacceptable and no other remedy is available. *Reddy v. Cascade Gen., Inc.*, 227 Or. App. 559, 567 (2009)(citation omitted). *See also Draper v. Astoria Sch. Dist. No. 1C*, 995 F. Supp. 1122, 1128 (D. Or. 1998).

Oregon courts have recognized two circumstances that give rise to the common-law tort of wrongful discharge: (1) discharge for exercising a job-related right of important public interest and (2) discharge for complying with a public duty. Examples of the first category include discharge for filing a worker's compensation claim, *Brown v. Transcon Lines*, 284 Or. 597 (1978), and resisting sexual harassment by a supervisor, *Holien v. Sears, Roebuck & Co.*, 298 Or. 76 (1984). Examples of the second category include discharge for serving on jury duty, *Nees v. Hocks*, 272 Or. 210 (1975); for reporting patient abuse at a nursing home, *McQuary v. Bel Air Convalescent Home, Inc.*, 69 Or. App. 107 (1984); and for refusing to sign a false report regarding a fellow employee's work-related conduct, *Delaney v. Taco Time Int'l Inc.*, 297 Or. 10 (1984).

**B.   Plaintiff may not bring a claim for wrongful discharge as stated.**

As noted, Plaintiff alleges Defendants "interfer[ed] with, retaliat[ed], and discriminat[ed] against Plaintiff for inquiring about and/or utilizing the provisions of OFLA and/or

28 - OPINION AND ORDER

FMLA."  Under Oregon law, however, "a wrongful discharge claim is not available to a plaintiff who alleges that [he] was discharged in violation of a right in contrast to being discharged for pursuing that right."  *Dunn v. CSK Auto, Inc.*, No. CV-05-116-HU, 2006 WL 1491444, at *6 (D. Or. May 22, 2006).  For example, in *Cross v. Eastlund*, the Oregon Court of Appeals held the plaintiff, who claimed to have been discharged because of pregnancy, did not have a wrongful-discharge claim because she did not assert she pursued any right, but only that she was discharged in violation of a right.  103 Or. App. 138, 142 (1990).  *See also Kofoid v. Woodard Hotels, Inc.*, 78 Or. App. 283, 287-88 (1986)("A discharge because of sex is not within any of the pursuance of rights or obligations exceptions to the rule of at will discharge, and it is clear that the Supreme Court has not yet recognized common law actions for wrongful discharge other than those exceptions. . . .  In all other cases, the statutory action is the only remedy, in addition to the administrative complaint procedure available through the Bureau of Labor.").  Accordingly, because Plaintiff asserts a claim for wrongful discharge based on the allegation that Defendants terminated her for taking FMLA or OFLA leave, the Court grants Defendants' Motion for Summary Judgment.

29 - OPINION AND ORDER

C.   **Merits.**

At the August 1, 2012, hearing Plaintiff asserted the
Court reasonably can infer from the short time between
Plaintiff's January 21, 2010, renewal of her request for
intermittent FMLA leave and her February 8, 2010, termination
that Plaintiff's request for FMLA leave was a negative factor in
Defendants' decision to terminate her.  To further support her
position, Plaintiff points out that Ohlstein was present in the
meeting at which Plaintiff used Enriquez's PHI, but Ohlstein was
not subjected to the same level of discipline as Plaintiff.
Sherlock, however, did not conclude in her investigation nor did
the report from OCR indicate that Ohlstein was aware Plaintiff
had improperly obtained Enriquez's PHI.  The record, therefore,
does not reflect Ohlstein engaged in conduct that was substan-
tially similar to the conduct of Plaintiff.

As noted, it is undisputed that McGowan did not believe
Plaintiff was qualified for the PCM position when Plaintiff was
promoted in October 2007, which was well before Plaintiff made
any requests for FMLA leave.  The record does not reflect McGowan
failed to support Plaintiff's promotion to PCM for any reason
other than the fact that Plaintiff did not have the required
educational background and/or managerial experience.  Thus,
McGowan's failure to support Plaintiff's promotion does not give
rise to an inference that Plaintiff's applications for and/or use

of FMLA leave in 2009 and 2010 was a negative factor in McGowan's decision to terminate Plaintiff.

Moreover, Plaintiff requested intermittent FMLA leave in January 2009 and was never denied FMLA leave throughout 2009. Even though Plaintiff received a Level II Corrective Action shortly after she returned from her March-May 2009 FMLA leave, the record reflects Gilronan drafted the Level II Corrective Action in December 2008, which was before Plaintiff requested FMLA leave. The record also reflects the Level II Corrective Action was not delivered until early June 2009 because the OCR provided Kaiser with its conclusion on May 21, 2009, that Plaintiff had intentionally violated HIPPA and the OCR directed Kaiser to issue a corrective action against Plaintiff within 30 days of its decision. Accordingly, Kaiser was required to issue the corrective action shortly after Plaintiff returned from FMLA leave. As a result, Plaintiff was on a corrective-action plan months before she renewed her request for FMLA leave in January 2010.

In addition, even though Sherlock recommended a Level III Corrective Action after her investigation of the Enriquez matter, Gilronan, with the approval of McGowan, gave Plaintiff only a Level II Corrective Action. Thus, Gilronan would have been justified in imposing a higher-level corrective action, but she did not even though Plaintiff had recently taken FMLA leave,

31 - OPINION AND ORDER

which suggests Plaintiff's FMLA leave was not a negative factor in Defendants' decision to issue the Level II Corrective Action.

The record also reflects McGowan received numerous complaints about Plaintiff's performance at the end of 2009 and the beginning of 2010.

In summary, the Court concludes no reasonable juror could find on this record that either Plaintiff's use of FMLA leave or the renewal of her request for intermittent FMLA leave constituted a negative factor in Defendants' decision to terminate Plaintiff's employment.

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's FMLA and OFLA claims.

In addition, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's wrongful-discharge claim for the same reasons the Court granted Defendants' Motion for Summary Judgment as to her FMLA and OFLA claims.

## II.  Plaintiff's Whistleblowing Claims.

In the Fourth and Fifth Claims of her Third Amended Complaint Plaintiff alleges Kaiser, in violation of Oregon Revised Statute § 659A.199,

> violated various state and/or federal laws, rules,
> or regulations and subjected Plaintiff to
> retaliation, and discrimination for reporting in
> good faith information Plaintiff believed to be
> evidence of unlawful conduct.  Defendants' actions
> violated of one or more of the following state
> and/or federal laws, rules, or regulations: ORS
> 659A.030; OFLA ORS 659A.150 *et seq.*, including ORS

659A.183; FMLA 29 U.S.C. § 2601 *et seq.*; Oregon
Rehabilitation Act ORS 659A.100 *et seq.*, including
ORS 659A.109/112; ORS 162.065 (subordination of
perjury); ORS 659.805 (blacklisting); and ORS
163.700; ORS 164.085; ORS 165.007; ORS 165.080;
HIPPA; Age Discrimination in violation of the ADEA
29 U.S.C. § 623, *et seq.,*

Plaintiff also alleges Kaiser, in violation of Oregon Revised

Statute § 659A.230,

discriminated and retaliated against Plaintiff for
participation in a civil proceeding as defined by
OAR 839-010-0140(1)(a-b), by taking adverse
employment actions against her culminating in the
termination of her employment.  As discussed
above, Plaintiff testified as a witness in a
pending civil matter, wherein Defendants where
being sued by another former employee, a short
time before her termination from employment.
Prior to, and during the course of the proceeding,
Plaintiff was coached to make statements which
would have constituted perjury by agents of
Defendants KAISER, which she opposed and resisted.
Plaintiff also informed Defendants KAISER that she
had received information from BOLI and intended to
complain to that agency regarding retaliation
against her.  A short time later, Plaintiff was
terminated.

In addition, Plaintiff alleges as part of her Eighth Claim

for wrongful discharge that

[a]t all materials times, the public policy of the
State of Oregon was to prohibit an employer from
. . . retaliation . . . against employees for good
faith reporting of illegal and/or criminal conduct
and/or participating a civil proceeding against
Defendants.

* * *

Defendants, through their agents and/or
employees, violated these public policies by . . .
retaliating . . . against Plaintiff for good faith
reporting of illegal conduct and/or participating

33 - OPINION AND ORDER

in a civil proceeding against Defendants. . . .
Defendants violated the above public policies in
terminating Plaintiff.  The discharge was unlawful
and in violation of the public policy of the State
of Oregon.

Defendants' discharge of Plaintiff was in
retaliation for Plaintiff's pursuit and exercise
of Plaintiff's rights related to Plaintiff's role
as an employee, including the right to protected
medical leave without fear of retaliation, which
rights are of important public interest.

Third Am. Compl. at ¶¶ 99-101.

Plaintiff contends in her Supplemental Statement of Facts
that the following activities were protected activities that form
the basis of her retaliation claims, including her whistleblowing
claim and portions of her claim for wrongful discharge:

(1)  terminating Enriquez;

(2)  terminating Pacosa;

(3)  the February 5, 2009, letter to Kaiser from Plaintiff's
counsel;

(4)  Plaintiff's February 5, 2009, call to the Kaiser
hotline;

(5)  Plaintiff's December 15, 2009, meeting with Smith;

(6)  Plaintiff's January 8, 2010, meeting with McCulloch;

(7)  Plaintiff's January 18, 2010, and February 8, 2010,
meetings with McGowan when he refused to allow
Plaintiff's husband and friend to attend; and

(9)  Ferguson advising McGowan during Plaintiff's post-
termination grievance.

34 - OPINION AND ORDER

**A.    The Law.**

Oregon Revised Statute § 659A.199(a) provides:

> It is an unlawful employment practice for an
> employer to discharge, demote, suspend or in any
> manner discriminate or retaliate against an
> employee . . . for the reason that the employee
> has in good faith reported information that the
> employee believes is evidence of a violation of a
> state or federal law, rule or regulation.

Oregon Revised Statute § 659A.230 provides in pertinent part:

> It is an unlawful employment practice for an
> employer to discharge, demote, suspend or in any
> manner discriminate or retaliate against an
> employee . . . for the reason that the employee
> has . . . testified in good faith at a civil
> proceeding.

To survive summary judgment on a whistleblower claim
under §§ 659A.199 or 659A.230, a plaintiff must identify

> the existence of facts from which a reasonable
> fact finder could conclude . . . she engaged in
> protected activity . . . [and] defendant[]
> retaliated against her in response to that
> activity. . . . [I]f the employer asserts a
> non-discriminatory reason for the employee's
> termination, the plaintiff must show that the
> employer would not have made the same decision
> absent a discriminatory motive.

*Merrill v. M.I.T.C.H. Charter Sch. Tigard*, No. 10-CV-219-HA, 2011
WL 1457461, at *7 (D. Or. Apr. 4, 2011)(citations omitted). *See
also Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011)
(applies burden-shifting framework to state and federal claims);
*El-Hakem v. BJY Inc*, 415 F.3d 1068, 1076 (9th Cir. 2005)(requires
the employee to prove that he was discharged or discriminated
against because of his wage claim).

35 - OPINION AND ORDER

To establish a *prima facie* case of retaliation under
Oregon Revised Statutes §§ 659A.199 and 659A.230, "[p]laintiff
'must show (1) she was engaging in a protected activity, (2) she
suffered an adverse employment decision, and (3) there was a
causal link between the protected activity and the adverse
employment decision.'"  *Sandberg v. City of N. Plains*, No.
10-CV-1273-HZ, 2012 WL 602434, at *7 (D. Or. Feb. 22, 2012)
(quoting *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782,
785 (9th Cir. 1986)).  *See also Shultz v. Multnomah Cnty.*, No.
08-CV-886-BR, 2009 WL 1476689, at *13 (D. Or. May 27, 2009)
(same).

To establish causation, the plaintiff must show her
protected activity was a "'substantial factor in the motivation
to discharge the employee.'"  *Sandberg*, 2012 WL 602434, at *7
(quoting *Estes v. Lewis and Clark College,* 152 Or. App. 372, 381
(1998)).  *See also Huff v. City of Portland*, Civ. No. 05-1831-AA,
2008 WL 1902760, at *6 (D. Or. Apr. 28, 2008)("Plaintiff bears
the burden of establishing that her alleged disclosures
constituted 'a substantial factor' in the discontinuation of her
employment.").  "[T]o be a substantial factor, the employer's
wrongful purpose must have been 'a factor that made a difference'
in the discharge decision."  *Estes*, 152 Or. App. at 381 (citing
*Nelson v. Emerald People's Util. Dist.*, 116 Or. App. 366, 373
(1992)).

36 - OPINION AND ORDER

If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to rebut the inference of retaliation by offering a legitimate, nondiscriminatory reason for the employee's termination. If the defendant successfully rebuts the inference of retaliation, the burden of production shifts back to the plaintiff to show that the defendant's explanation is merely a pretext for impermissible retaliation. *Neighorn v. Quest Health Care*, No. 1:10-CV-03105-CL, 2012 WL 1566176, at *28 (D. Or. May 2, 2012).

**B.   Enriquez and Pacosa terminations.**

Defendants assert Plaintiff's involvement in the reporting of violations by Enriquez and Pacosa and her role in their terminations is not protected activity because Plaintiff, as their manager, merely took part in disciplining her subordinates as part of her job. Defendants rely on *Dinsmore v. U.S. Bank Nat. Ass'n*, 2011 WL 1559407 (D. Minn. Apr. 22, 2011), to support their position. The court in *Dinsmore*, however, noted under the Minnesota whistleblower statute that "[r]eports made in fulfillment of job obligations may constitute protected conduct. An employee's assigned job duties are relevant, however, in considering whether a report is made to expose an illegality." *Id*. (quotation omitted). Thus, the court did not hold reports made in fulfillment of job duties may not constitute protected conduct, and, therefore, *Dinsmore* does not support Defendants'

position.

Defendants, however, also assert Plaintiff has failed to establish a causal connection between Plaintiff's participation in the Enriquez and Pacosa matters and her termination. The Court agrees.

The record reflects McGowan ordered the time-card audit, and a Kaiser employee other than Plaintiff discovered Enriquez's time-card irregularities. Similarly, Kaiser discovered Pacosa's violations when Pacosa's wife reported he improperly accessed and used her PHI and Sherlock investigated those claims against Pacosa. Thus, even though the time-card audit produced evidence of Enriquez's time-card irregularities after Plaintiff began the disciplinary process against Enriquez, Defendant was already well aware of those issues.

Accordingly, to the extent that Plaintiff contends she was terminated for reporting the violations of Enriquez and Pacosa, Plaintiff fails to establish causation.

With respect to the termination of Enriquez and Pacosa, the record reflects everyone at Kaiser involved with the situation supported the decisions to terminate Enriquez and Pacosa. Gilronan believed the process should not have been as accelerated as it was as to Enriquez, but she did not disagree that Enriquez ultimately should be terminated for time-card fraud. Similarly, although Ferguson would have preferred to

38 - OPINION AND ORDER

offer Pacosa the option to resign or to retire, Ferguson agreed
Pacosa could no longer work for Kaiser after his misuse of his
wife's PHI.

The Court concludes on this record that no reasonable
juror could conclude Plaintiff was terminated or retaliated
against for participating in disciplining Enriquez and Pacosa or
for terminating those individuals.

C.    **February 5, 2009, letter and Hotline call.**

As noted, Plaintiff asserts her February 5, 2009,
Hotline complaint and the February 5, 2009, letter from her
attorney constitute protected activity that was a cause of her
termination.

It is undisputed that Plaintiff did not provide her
name when she made the Hotline call, and Plaintiff testified at
deposition that no one at Kaiser other than Gardner and Sherlock
knew she made the Hotline complaint.  In her Response to
Defendants' Motion for Summary Judgment, Plaintiff attempts to
rely on inadmissible hearsay by Gilronan to show that individuals
other than Gardner and Sherlock may have known Plaintiff made the
hotline call.  Plaintiff states in her Declaration that in June
2009 "Gilronan informed [Plaintiff] that Ferguson and McGowan
believed [she] was behind the February 2009 Hotline complaint and
intended to hyper-scrutinize [her] job performance until [they]
could document enough to get rid or me, after he terminated

Gilronan." Decl. of Kimerie Larmanger at ¶ 19. Plaintiff does
not indicate she is quoting Gilronan in her Declaration, and,
therefore, it is not possible to determine whether those were
Gilronan's actual words or Plaintiff's paraphrase of Gilronan's
statements. In addition, the record does not reflect Gilronan
testified about this interaction and Plaintiff is not clear in
her Declaration whether Gilronan was paraphrasing McGowan or
Ferguson, whether the statements were made by either McGowan or
Ferguson, or who specifically made which statement. Plaintiff
also fails to identify any exception to the hearsay rule that
would allow this portion of her testimony to be admissible. The
Court, therefore, declines to consider this portion of
Plaintiff's Declaration as evidence that McGowan, Ferguson, or
Gilronan believed Plaintiff made the February 2009 Hotline
complaint. Although the record reflects Sherlock knew Plaintiff
made the Hotline complaint, it is undisputed that Sherlock was
not involved in Plaintiff's termination. Plaintiff, therefore,
has not established the Hotline complaint was a cause of her
termination.

        In addition, the record reflects Gilronan drafted the
Level II Corrective Action against Plaintiff in December 2008 and
advised Plaintiff in January 2009 that she was going to receive a
corrective action. Accordingly, before Plaintiff made the
February 5, 2009, Hotline complaint and before Plaintiff's

40 - OPINION AND ORDER

counsel sent the February 5, 2009, letter, it had already been decided that Plaintiff would receive a corrective action. Although Gilronan did not issue the corrective action until June 2009, the record reflects the timing of the corrective action was the result of (1) the OCR's need to finish its investigation, (2) Plaintiff's absence from work, and (3) OCR's requirement that Kaiser issue a corrective action within 30 days of its recommendation.

To the extent that Plaintiff contends the November 2009 Level III Corrective Action issued by McGowan was in retaliation for the letter and/or Hotline complaint, the facts do not support her position because the letter and complaint occurred nine months before McGowan issued the Level III Corrective Action.  In addition, Plaintiff's counsel mentioned only Ferguson's conduct in the February 5, 2009, letter, and the record reflects Ferguson was not responsible for or involved in the decision to issue the November 2009 Level III Corrective Action.  Moreover, the record does not support an inference that McGowan, who was responsible for issuing the November 2009 Level III Corrective Action, would have retaliated against Plaintiff based on her complaint about Ferguson's alleged conduct.

**D.    Plaintiff's meetings with Smith and McCulloch.**

Plaintiff also alleges in her Supplemental Statement of Facts that Defendants retaliated against her because of her

41 - OPINION AND ORDER

meetings with Smith and McCulloch, which, according to Plaintiff, were protected activities.

Plaintiff testified at deposition that she advised Smith at the December 2009 meeting and McCulloch at the January 2010 meeting that Ferguson was "writing Corrective Actions, holding people to 100 percent standards [which is] . . . unrealistic and unfair."  Pl.'s Dep. at 232-34, 266.  Plaintiff does not allege she told Smith or McCulloch that Ferguson's corrective actions were "unfair" because Plaintiff was a member of some protected class nor did she state some other unlawful reason.  Plaintiff also does not allege she reported unlawful conduct or criminal activity or that she opposed some unlawful discrimination in her meetings with Smith and McCulloch. Accordingly, Plaintiff has not established her meetings with Smith or McCulloch constitute protected activity.  *See, e.g., Carrasco v. San Ramon Valley Unified Sch. Dist.*, 258 F. App'x 114, 115 (9th Cir. 2007) ("[W]ithout referring to discrimination by the [defendant], the petition circulated by [the plaintiff] cannot be opposed to unlawful activity under Title VII."); *Jamal v. Wilshire Mgmt. Leasing Corp.*, 320 F. Supp. 2d 1060, 1079 (D. Or. 2004)(the plaintiff's complaint was not a protected activity as a matter of law because she did not mention discrimination when she complained of her supervisor's treatment of her); *Kitchen v. WSCO Petroleum Corp.*, 481 F. Supp. 2d 1136, 1145 (D.

42 - OPINION AND ORDER

Or. 2007)(the plaintiff's complaint that he was "set up for failure" was not a protected activity under Title VII).

Even if these meetings constitute protected activity, Plaintiff has not established a causal connection between the meetings and any alleged retaliation by Defendants. For example, there is not any evidence in the record that McCulloch or Smith were involved in Plaintiff's termination or that McGowan knew Plaintiff met with Smith or McCulloch when he terminated Plaintiff. Finally, by the time she met with Smith and McCulloch, Plaintiff already had received two corrective actions and McGowan had received numerous complaints about Plaintiff's performance.

**E.    Plaintiff's January and February 2010 meetings with McGowan.**

Plaintiff asserts McGowan retaliated against her after the January 18, 2010, meeting because their interaction at that meeting allegedly upset him. Plaintiff relies on the fact that she was terminated three weeks after the January 18, 2010, meeting. As noted, however, by January 18, 2010, Plaintiff had received two corrective actions, the OCR had concluded Plaintiff intentionally used Enriquez's PHI in violation of HIPPA, and McGowan had received numerous complaints about Plaintiff's performance. On this record the Court finds no reasonable juror could conclude Plaintiff's interactions with McGowan at the January 18, 2010, meeting were the cause of Plaintiff's

43 - OPINION AND ORDER

termination.

The record also reflects Plaintiff did not have a right to have a friend present at the February 8, 2010, termination meeting.  McGowan had already advised Plaintiff at the January 18, 2010, meeting that attempting to bring a third party to the meeting would be viewed as insubordination, and McGowan already had concluded Plaintiff's relationship with her staff had become "irreparable" based on the numerous complaints he had received from staff members.  On this record the Court finds no reasonable juror could conclude Plaintiff's interactions with McGowan at the February 8, 2010, meeting were the cause of Plaintiff's termination.

**F.    Plaintiff's Performance.**

As to all of Plaintiff's claims for retaliation, Defendants point out that McGowan received several complaints about Plaintiff's performance as manager from a number of different Kaiser employees before McGowan issued the Level III Corrective Action, and McGowan received additional complaints before he terminated Plaintiff's employment.

In response, Plaintiff offers a summary of the results of the January 2010 survey related to Plaintiff's performance. As Defendants note, however, the alleged survey results consist of out-of-court statements by unidentified individuals, are inadmissible hearsay, and lack foundation.  Plaintiff,

44 - OPINION AND ORDER

nevertheless, purports to authenticate the survey results in her
Declaration by stating

> a survey of my performance conducted by Dr. Varan,
> and completed by her staff recently did not
> contain . . . concerns [about my performance] and,
> in fact, contained mostly positive comments about
> my communication style.  A true and correct copy
> of Dr. Varan's email and the survey results are
> attached hereto as Exhibit B.

Larmanger Decl. at ¶ 31.  Although Plaintiff states Dr. Varan's
email is attached to her Declaration, the email that is actually
attached is from Smith requesting staff "feedback on the
effectiveness of the [HR] Department in meeting your needs.
Please complete the HR Satisfaction Survey below by February 5."
Larmanger Decl., Ex. B at 1.  In addition, Plaintiff testified at
deposition that the results of the survey did not come to her and
that she cannot remember who the survey went to or who responded
to it.  Plaintiff, therefore, cannot and has not authenticated
the survey through her Declaration.  Accordingly, the alleged
results of the survey are inadmissible hearsay and do not rebut
Defendants' evidence of Plaintiff's performance issues.

In summary, on this record the Court finds no reasonable
juror could conclude Plaintiff has established any of her alleged
protected activities were the cause of her termination.
Accordingly, the Court grants Defendants' Motion for Summary
Judgment as to Plaintiff's whistleblowing claims and that portion
of her claim for wrongful discharge in which she alleges

45 - OPINION AND ORDER

retaliation for protected activities.

**III. Plaintiff's claim for retaliation in violation of Oregon Revised Statute § 659A.030(1)(f).**

Plaintiff alleges in her Sixth claim that she "engaged in protected activity when [she] complained about and opposed Defendants' unlawful employment discrimination and retaliation as alleged supra." Third Am. Compl. at ¶ 90. At the August 1, 2012, hearing, Plaintiff confirmed her claim under § 659A.030(1)(f) is based on the same conduct as her whistle-blowing and FMLA retaliation claims.

To establish a *prima facie* case of retaliation under § 659A.030, a plaintiff must show

> (1) he engaged in a protected activity, (2) the defendant subjected the plaintiff to an adverse employment action, and (3) a causal link exists between the protected activity and the adverse action.

*Manatt v. Bank of Am., NA,* 339 F.3d 792, 800 (9th Cir. 2003) (quotation omitted). *See also Harris v. Pameco Corp.*, 170 Or. App. 164, 178-79 (2000)("A plaintiff seeking to establish a *prima facie* case of retaliation under ORS 659A.030(1)(f) must establish the same elements as are required under Title VII.").

The elements of a *prima facie* case under § 659A.030(1)(f) and the analysis of a claim under that statute do not differ in any substantive way from the standards that govern or the analysis that applies to Plaintiff's other whistleblowing and retaliation claims.

46 - OPINION AND ORDER

Accordingly, for the same reasons the Court granted Defendants' Motion for Summary Judgment as to Plaintiff's Second, Fourth, and Fifth Claims, the Court also grants Defendants' Motion for Summary Judgment as to Plaintiff's Sixth Claim.

**IV.  Aiding and Abetting in violation of § 659A.030(1)(g).**

In her Seventh Claim Plaintiff alleges Ferguson and McGowan "participated in and provided substantial assistance to Defendants KAISER and each other in ongoing discrimination, retaliation, and harassment of Plaintiff at the work place as described above."  Third Am. Compl. at ¶ 95.

Oregon Revised Statute § 659A.030(1)(g) provides in pertinent part:  "It is an unlawful employment practice: . . . For any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."

Defendants assert Plaintiff's claim of aiding and abetting fails because her discrimination and retaliation claims fail. The Court agrees.  *See Javansalehi v. BF & Assoc., Inc.*, No. 3:10-CV- 850-PK, 2011 WL 5239752 (D. Or. Nov 1, 2011)("Because . . . [the plaintiff] cannot as a matter of law prevail on her claim for unlawful-practice-opposition retaliation, [individual] defendants are entitled to summary judgment in connection with" the plaintiff's aiding and abetting claim.), *reversed on reconsideration on other grounds by Javansalehi v. BF & Assoc.,*

47 - OPINION AND ORDER

*Inc.*, No. 3:10-CV-850-PK, 2012 WL 1566184 (D. Or. May 2, 2012).

Accordingly, the Court grants Defendants' Motion for Summary Judgment as to Plaintiff's Seventh Claim.

## CONCLUSION

For these reasons, the Court **GRANTS** Defendants' Motion (#102) for Summary Judgment as to Plaintiff's First, Second, Fourth, Fifth, Sixth, Seventh, and Eighth Claims.

IT IS SO ORDERED.

DATED this 7th day of September, 2012.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge